**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| STS OPERATING, INC. d/b/a SUNSOURCE., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. |
| | § | |
| BRIAN BOWMAN, NICK BOWMAN, J&B | § | |
| SOLUTIONS, INC., and S & T HYDRAULICS, | § | |
| LLC, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff STS OPERATING, INC. d/b/a SunSource ("SunSource"), for its Complaint for Injunctive Relief against Defendants Brian Bowman ("Brian"), Nick Bowman ("Nick"), J&B Solutions, INC. ("J&B"), and S & T Hydraulics, LLC ("S&T") (collectively, "Defendants"), states as follows:

## NATURE OF THE ACTION

1.      This is an action for conspiracy, fraud, aiding and abetting, breach of contract, breach of fiduciary duty, tortious interference with contract, and actual or threatened misappropriation of trade secrets. Sun/Source seeks damages and injunctive relief.

2.      SunSource is a leading distributor and remanufacturer of industrial hydraulic and pneumatic products. SunSource works with customers across a variety of industries to provide equipment that moves and distributes fluids on an industrial scale, including pumps, filters, flowmeters, power units, manifolds, actuators, hydrostatic drives, and electronic controls. Beyond providing products to its customers, SunSource maintains a key advantage in its business by providing certified remanufacturing services. Through the remanufacturing process, SunSource

takes a customer's malfunctioning equipment and repairs that equipment back to the same precise specifications as the originally-manufactured part.

3.      One of SunSource's most important customer sectors is the oil and natural gas extraction industry. SunSource distributes a wide variety of products necessary for the extraction of oil and natural gas products, both in Texas and throughout the United States.

4.      Brian Bowman and Nick Bowman ("the Bowmans") are brothers and former Account Managers at SunSource, with direct responsibility for sales and service for SunSource customers including those in the oil and gas industry. Recently, SunSource learned that Brian—during the course of his employment with SunSource and with Nick's knowledge and assistance—is diverting business away from SunSource and encouraging SunSource customers to instead purchase competing products and services from two competing companies: S&T and J&B. S&T is owned by the Bowmans' parents, and Brian has a financial interest in that company. J&B is, upon information and belief, wholly owned by Brian and his wife.

5.      SunSource also learned that the Bowmans engaged in a fraudulent scheme by which they misdirected products designated for repairs and remanufacturing from an authorized SunSource vendor to S&T. The Bowmans then had the SunSource-authorized vendor issue invoices to make it appear as though the authorized vendor performed the services, when all the while S&T was providing those services. Additionally, SunSource learned that the Bowmans had S&T sell parts to an authorized SunSource vendor who in turn sold the parts to SunSource without its knowledge.

6.      Upon discovering their misconduct, SunSource placed the Bowmans on administrative leave on October 22, 2019.

7.     After placing the Bowmans on administrative leave, SunSource conducted a forensic examination of the computers issued by SunSource to the Bowmans, along with Nick's SunSource-issued cell phone. That investigation confirmed that the Bowmans have been misappropriating and using SunSource's confidential and trade secret information, including highly sensitive information regarding SunSource's customers, in order to divert business to S&T and J&B. J&B was aware of the restrictions in the Bowmans' agreements with SunSource because it is owned by Brian. Upon information and belief, S&T was fully aware of the restrictions in the Bowmans' agreements with SunSource. Both J&B and S&T financially incentivized the Bowmans to breach their agreements with SunSource.

8.     After the conclusion of its forensic investigation into the Bowmans' activities, SunSource terminated the Bowmans for cause on November 8, 2019.

9.     The Bowmans' actions are in breach of their agreements and their fiduciary duties owed to SunSource, as well as a violation of Texas state and federal law. S&T's and J&B's actions are also a violation of Texas state and federal law.

10.     The Bowmans' actions, and their involvement in both S&T and J&B, indicate that they plan to continue to trade on SunSource's goodwill and confidential and trade secret information by diverting SunSource customers to S&T and J&B, in order to further enrich themselves at the expense of SunSource.

11.     Before SunSource's customer relationships, confidential information, trade secrets, and goodwill can be further eroded, SunSource seeks injunctive relief.

12.     SunSource seeks to enjoin the Bowmans from: (1) directly or indirectly breaching their agreements with SunSource; (2) utilizing or disclosing SunSource's confidential and trade secret information; and (3) possessing SunSource's confidential and trade secret information.

SunSource also seeks an injunction against S&T and J&B to prevent S&T and J&B from utilizing or possessing SunSource's confidential and trade secret information.

## PARTIES

13.     SunSource is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Addison, Illinois. SunSource operates a service center in Grand Prairie, Texas which the Bowmans routinely traveled to in the course of their duties.

14.     Brian Bowman is a Texas citizen, domiciled and residing in Granbury, Texas.

15.     Nick Bowman is a Texas citizen, domiciled and residing in Granbury, Texas.

16.     S&T is a limited liability company organized under the laws of the State of Texas, with its principal place of business in Granbury, Texas.

17.     J&B is a corporation organized under the laws of the State of Texas, with its principal place of business in Granbury, Texas.

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction over this action under 28 U.S.C. §1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000, excluding interest and costs. In addition, the Court has jurisdiction over SunSource's claim brought under the Defend Trade Secrets Act, pursuant to 28 U.S.C. § 1331, and this Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over each of the Defendants, and venue is proper in this District under 28 U.S.C. § 1392(b)(1), because all of the Defendants reside in this judicial district and are residents of the State of Texas. Venue is also proper in this District under 28 U.S.C. § 1392(b)(2) because a substantial part of the events giving rise to SunSource's claims occurred in this District. Specifically, the sales orders that the Bowmans submitted to SunSource were billed through SunSource's service center in Grand Prairie, Tarrant County, Texas.

## EVENTS GIVING RISE TO THIS ACTION

### SUNSOURCE'S BUSINESS

20.     SunSource is a leading distributor and remanufacturer of industrial hydraulic and pneumatic products in interstate commerce.   The breadth of the products and services that SunSource is able to offer enables SunSource to position itself as a "one stop shop" for its customers' fluid distribution needs. Beyond providing products to its customers, SunSource maintains a key advantage in its business by providing certified remanufacturing services as well. Through the remanufacturing process, SunSource takes a customer's malfunctioning equipment and repairs that equipment back to the same precise specifications as the originally-manufactured part.

21.     One of SunSource's most important customer sectors is the oil and natural gas extraction industry. SunSource distributes a wide variety of products necessary for the extraction of oil and natural gas products, both in Texas and throughout the United States.

22.     In particular, SunSource has developed a significant customer base in the oil and gas sector that uses hydraulic fracturing techniques, commonly referred to as "fracking."

23.     Through the fracking process, oil and gas producers inject a slurry of water, sand and other solids, and chemicals, commonly known as "fracking fluid," into a well. The fracking fluid, when injected under the extremely high pressures associated with fracking, breaks up underground rock formations. The breakup of those rock formations releases oil and natural gas that can then be extracted.

24.     Unsurprisingly, in light of the extreme pressures, chemicals, abrasive materials, and oil products involved, fracking takes a significant toll on the equipment used in the process. Accordingly, companies engaged in the fracking industry are in near-constant need of either new equipment, or repairs to their existing equipment through the remanufacturing process.

25.     SunSource has developed long-standing relationships with dozens of oil and natural gas producers in Texas to supply those customers with the equipment necessary for their operations. As Account Managers, the Bowmans were instrumental in maintaining and growing those customer relationships.

26.     Account Managers like the Bowmans are a critical part of SunSource's business model. Account Managers are the face of SunSource's business to its customers. As part of their job duties, the Bowmans would visit SunSource customers at their operations—whether in an oil field, in a machine shop, or at the client's headquarters—in a SunSource truck, to sell SunSource's products and services. In addition, while on site with a customer, the Bowmans would routinely pick up equipment that the customer might wish to have remanufactured, and would deliver that equipment to SunSource's service centers, including the service center in Grand Prairie, Texas.

27.     In order to fulfill their job responsibilities, the Bowmans were given access to SunSource's proprietary and confidential information about the company's existing and potential customers, including the equipment needs of those customers, key personnel who had authority for purchasing decisions for each customer, customers' preferences for certain products or manufacturers, and the customer's history of product purchases from SunSource.

28.     Beyond information about customers, the Bowmans were also given access to SunSource's proprietary and confidential information about the company's overall sales strategies, pricing structures and profit margins, amounts paid to vendors for certain remanufacturing work, the terms of SunSource's relationships with equipment manufacturers, the terms of SunSource's relationships with suppliers and other vendors, and other sensitive and proprietary information.

29.     The information to which the Bowmans were given access is strictly confidential, is a key driver of SunSource's success in its industry, and would be invaluable to one of

SunSource's competitors. In the hands of a competitor, the confidential and trade secret information to which the Bowmans had access would allow that competitor to target SunSource's customers by undercutting prices on specific products and/or services.

30.     Moreover, because of their customer-facing roles and duties as Account Managers, the Bowmans were in a unique position to direct customers toward purchasing products from a company other than SunSource. In light of their position, SunSource relies upon Account Managers like the Bowmans to abide by their fiduciary duties to SunSource while they are employed with the company, including their duty not to divert sales away from SunSource for their own personal gain.

**SUNSOURCE'S PROTECTION OF ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS**

31.     Because of the critical nature of SunSource's confidential and trade secret information and how it allows SunSource to succeed, SunSource closely guards its confidential information and trade secrets, and takes specific measures to restrict access to and preserve the confidentiality of this information, including, but not limited to, the following:

    a.  Requiring employees to sign agreements containing covenants designed to maintain confidentiality and to return SunSource's property upon resignation or termination;

    b.  Requiring its employees to maintain the confidentiality of SunSource's information as a condition of employment

    c.  Restricting access to computerized information through the use of passwords;

    d.  Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means); and

    e.  Restricting access to computerized company information based on each individual employee's "need to know" the particular information.

32.    SunSource rigorously maintains the confidentiality of its information because the information provides SunSource a competitive advantage in the marketplace from which SunSource derives economic value.

33.    Any SunSource competitor which possessed and used this confidential information would gain an immediate and unfair competitive advantage. Such confidential information includes SunSource's: (a) customer needs and preferences; (b) pricing and margin information; (c) SunSource's strategic plans as it relates to competing with other companies, (d) SunSource's strategic plans as it relates to its relationships with equipment manufacturers; (e) SunSource's multi-year strategic plans for its business with the oil and gas extraction industry, and (f) other sensitive, non-public information about SunSource, its business, its customers, and its employees.

34.    The Bowmans had access to, helped develop, and received confidential and trade secret information relating to all of this and more, while they were employed by SunSource.

35.    The value to SunSource of keeping this information secret is incalculable, but also very real. For one, SunSource expends considerable amounts of money every year in developing such information, including the amounts it pays its Account Managers, like the Bowmans, to develop such information. Beyond this though, the secrecy of such information drives SunSource's business with its customers. From its knowledge of customer needs and the secret nature of its pricing and sales strategies, SunSource is able to maintain its standing with its customers.

**THE BOWMANS' EMPLOYMENT WITH & CONTRACTUAL OBLIGATIONS OWED TO SUNSOURCE**

36.    Brian's employment with SunSource began on or about May 14, 2007. Brian began working at SunSource as an intern in Omaha, Nebraska. On the date of his termination, Brian was an Account Manager with an assigned territory covering Southern Texas and the cities of Fort Worth, Grand Prairie, Arlington, Cleburne, Waco, Austin, San Antonio, San Angelo, Stephenville, Brownwood, Granbury, Aledo, Pleasanton, and San Marcos. As part of his duties, Brian routinely

traveled to SunSource's service center in Grand Prairie, Texas. The majority of sales orders that Brian submitted to SunSource were processed through SunSource's service center in Grand Prairie. Additionally, the majority of remanufacturing work submitted by Brian took place in Grand Prairie.

37.    Nick's employment with SunSource began on or about April 9, 2014. Nick also began working at SunSource as an intern in Omaha, Nebraska. As of the date of his termination, Nick was an Account Manager with assigned territory covering Western Texas and the cities of Lubbock, Snyder, Sweetwater, Abilene, Weatherford, Midland-Odessa, Monahans, Artesia (New Mexico), Hobbs (New Mexico), El Paso, Pecos, and Cisco. As part of his duties, Nick routinely traveled to SunSource's service center in Grand Prairie, Texas. The majority of sales orders that Nick submitted to SunSource were processed through SunSource's service center in Grand Prairie. Additionally, the majority of remanufacturing work submitted by Nick took place in Grand Prairie.

38.    At the outset of their respective employment, and before they were given access to any of SunSource's confidential or trade secret information, the Bowmans were required to execute agreements with SunSource containing certain non-restrictive covenants which applied both during and after their employment. Brian's agreement with SunSource ("Brian's Agreement") is attached hereto as Exhibit A[1] and Nick's agreement with SunSource ("Nick's Agreement") (together, "the Agreements") is attached hereto as Exhibit B. While the Agreements contain slightly different language in certain sections, the Agreements are identical with regards to the obligations owed to SunSource at issue in this dispute

39.    Through the Agreements, the Bowmans agreed to protect and return SunSource's confidential and trade secret information both during and after their employment:

---

[1] Brian's Agreement is executed by "Brian Beebee." Brian's name was changed from Beebee to Bowman after execution of his Agreement.

> [D]uring your employment (except in the proper performance of your duties) and thereafter, howsoever arising, you will not directly or indirectly use (either for your own purposes or those of any other person, company, business entity, or other organization whatsoever) or disclose (to any person, company, business entity, or other organization whatsoever) any trade secrets or confidential information of the Company or its clients or customers…

(Ex. A. at p. 1, Ex. B at p. 1[2].)

40.     The Bowmans further agreed that the information that they agreed to protect would include, but not be limited to:

> [A]ny such information relating to clients or customers with whom you have had contact, client or customer lists with whom you have had contact, market information, business plans or financial dealings information and plans, trading models, market access information, research activities, any document marked confidential, or any information which you have been told is confidential or which you might reasonably expect the Company would regard as confidential, or any information which has been given the Company in confidence by customers, suppliers, or other persons….

(*Id.*)

41.     Nick also acknowledged that "[u]pon termination" of his employment he would "immediately return all confidential and trade secret information" to their respective managers. (Ex. B at p. 1.)

42.     In addition to covenanting that they would protect, maintain, and return SunSource's confidential information and trade secrets during and after their SunSource employment terminated, the Bowmans also agreed to certain post-employment non-competition and non-solicitation restrictions.

43.     Specifically, the Bowmans agreed that, for a period of two years following the termination of their employment for whatever reason, they would not:

---

[2] Nick's Agreement also restricts him from disclosing confidential information of SunSource "suppliers" along with customers and clients. *See* Ex. B at p. 1.) For purposes of this dispute, confidential information regarding SunSource's suppliers is not at issue.

> "[F]or whatever reason, contact, interfere with, solicit on behalf of another, accept business from, or attempt to entice away from the Company (or any affiliated or subsidiary of the Company): (a) any entity which is a client or customer of the Company at the time of your departure and with whom you had contact during your employment with the Company, (b) any contract, agreement, or agreement that the Company is actively negotiating or currently is in place with any other party at the time of your departure, and in which effort you participated, and/or (c) any prospective business opportunity that the Company has identified at the time of your departure, and in which you participated.

(Ex. A. at p. 1, Ex. B at p. 1.)

44.    Finally, the Bowmans agreed that they would not operate or have any interest in a competing business *during* their employment with SunSource, or for one year following the termination of their employment for any reason, within 100 miles of their territories:

> Furthermore, you agree that during your employment by the Company, and for a period of one year following the termination of your employment for whatever reason, you will not: (1) directly or indirectly, and in any way, whether as principal or as director, officer, partner, or stockholder (except for public companies) own, manage or operate any business located within a 100 mile radius of your primary workplace(s) at SunSource where you worked within a period of three years prior to the termination of your employment (a) that competes directly with SunSource and (b) in which you would be engaged in a substantially similar capacity as that in which you were engaged by SunSource; and (2) solicit or sell fluid power products within a 100 mile radius of your primary workplace(s) at SunSource where you worked within a period of three years prior to the termination of your employment to any customer to which the Company has sold products or services in the three years immediately preceding your termination.

(*Id.*)

45.    Through the Agreements, the Bowmans agreed that the restrictive covenants were reasonable and necessary to protect SunSource in the conduct of its business. (*Id.*) The Bowmans also agreed that if any provision of the Agreements was found to be invalid or unenforceable by reason of extent, duration, of geographic scope, the Agreements could be modified to be enforceable to the fullest extent permitted by law. (*Id.*)

46.     Nick also agreed that he would "indemnify, save, and hold harmless [SunSource] from and against any and all claims, damages, losses, costs, and expenses (including reasonable attorneys' fees)" arising from his breach of his Agreement. (Ex. B at p. 1.)

**SUNSOURCE DISCOVERS THE BOWMANS' MISCONDUCT**

47.     On or about September 13, 2019, one of SunSource's customers ("Customer 1")[3] contacted SunSource. Customer 1 informed SunSource that, while on a sales call on its premises on behalf of SunSource, Brian had spoken to the customer about S&T.

48.     Customer 1 relayed that Brian had told the customer that S&T could offer cheaper products and services that could save Customer 1 money.

49.     Customer 1 inquired whether Brian considered it to be a conflict of interest to be advocating for S&T while on a SunSource sales call.

50.     In response, Brian represented to Customer 1 that S&T was an approved overflow work shop for SunSource. Those representations were false.

51.     Prior to this incident, SunSource was aware of the existence of S&T because the Bowmans' father, Scott Bowman, is one of the proprietors of S&T. On occasions when it has no more capacity at its own facilities to perform remanufacturing work, SunSource will outsource "overflow" remanufacturing work to approved vendors. Scott Bowman, while employed by SunSource in Omaha, Nebraska, would perform overflow remanufacturing for other SunSource Service Centers on an as-needed basis. Scott Bowman later moved to Texas, and formed S&T in 2017. S&T previously had reached out to SunSource and inquired how it could become approved as a vendor for remanufacturing services. S&T was not approved by SunSource because it did not have the requisite level of liability insurance required by SunSource from its vendors, and because

---

[3] Because the identity of SunSource's customers is a closely-guarded trade secret, SunSource has not included that customer's name here but will identify this customer upon the entry of a protective order by this Court.

SunSource had concerns over the remanufacturing work that S&T was performing. Brian was fully aware that S&T had not been approved by SunSource as a vendor for remanufacturing services.

52.    On September 20, 2019, SunSource received an invoice from a delivery vendor used by Account Managers to pick up and deliver SunSource products. The invoice contained two charges that further raised SunSource's suspicions as to Brian's activity: (1) a delivery from Brian's residence to a customer, which was being charged to SunSource, and (2) a delivery from "S T Hydralics" to a customer, which was being charged to SunSource.

53.    Upon being informed by Customer 1 that Brian was filling out vendor applications on behalf of S&T while on a SunSource sales call, and in light of the questionable charges on the aforementioned shipping invoice, SunSource conducted a further investigation into Brian's activities.

54.    SunSource discovered that Defendant J&B had recently sold a flowmeter to another one of SunSource's longstanding customers ("Customer 2.") A flowmeter is a piece of hydraulic equipment offered by SunSource.

55.    While SunSource was aware that Brian was the owner, with his wife, of a separate company called J&B Solutions, SunSource was never informed that J&B sold competing hydraulic equipment. Rather, SunSource believed that J&B was a real estate venture.

56.    If SunSource had known that J&B was in the business of selling competing hydraulic products, it never would have permitted Brian to have any interest or involvement in J&B while he was employed by SunSource.

57.    During its investigation, SunSource also discovered questionable packing slips and shipping documents between Brian and one of the SunSource vendors with whom Brian often worked: Intertech Fluid Power ("Intertech").

58.    When SunSource contacted Intertech to inquire about those questionable documents, it discovered additional misconduct. Intertech informed SunSource that years beforehand, when Scott Bowman first moved to Texas and formed S&T, Scott Bowman and Brian had approached Intertech about an arrangement whereby S&T would sell products to Intertech, which Intertech would then sell to SunSource after adding its own markup. SunSource was never informed that S&T was the original source of those products, that it was being charged markup by two companies for those products, or that Brian had arranged this transaction for S&T while he was employed by SunSource. Intertech also informed SunSource that this business arrangement had significantly increased recently, to the point where SunSource was purchasing hundreds of thousands of dollars' worth of products that originated from S&T, without SunSource's knowledge.

59.    Intertech is also one of the vendors that occasionally performs overflow remanufacturing work for SunSource, as described above. During the course of SunSource's investigation, Intertech informed SunSource that it had outsourced some of SunSource's overflow work to S&T, at Brian's direction and with his encouragement. Again, this arrangement was never disclosed to SunSource, which had already indicated to S&T that it would not be an approved vendor for remanufacturing services because it would not meet SunSource's insurance requirements. At the time that he was encouraging Intertech to use S&T for subcontracted remanufacturing work from SunSource, Brian was fully aware that S&T was not an approved vendor to perform work for SunSource.

60.    Finally, SunSource learned from yet another customer ("Customer 3") that Brian, while on a sales calls for SunSource and operating from a SunSource truck, sold that customer a centrifugal pump (or "C-pump").

61.    The C-pump that Brian sold to Customer 3 was not a product offered by SunSource, and for good reason. One of SunSource's manufacturer partners had specifically requested that SunSource not distribute that product, since the manufacturer itself sold that product directly. To preserve its relationship with the manufacturer, SunSource agreed that it would not sell that C-pump to customers or permit its sales force to do so.

62.    Brian's sale of a C-pump that SunSource *specifically* agreed it would not sell, while he was on a SunSource sales call and from a SunSource truck, could have jeopardized SunSource's critical relationship with its manufacturer partner.

63.    As part of its investigation, SunSource also reviewed Brian's company-issued email account. Through that review, SunSource discovered that Nick had recently sent purchase orders for one of SunSource's customers in Nick's territory to Brian. Nick and Brian do not share a common territory, nor do they share any customers. Put differently, there is no legitimate business reason for Nick to have sent purchase orders, which contain confidential information about SunSource's customers in Nick's territory, the types of products that those customers are purchasing from SunSource, and the prices charged to those customers, to Brian.

SUNSOURCE CONFRONTS THE BOWMANS AND FURTHER INVESTIGATION

64.    In light of the considerable evidence of their misconduct, SunSource met with the Bowman separately on October 22, 2019.

65.    SunSource first met with Nick. Nick denied any knowledge of Brian's activities, denied knowing anything about the activities of J&B or S&T, and, at one point, when asked if the "J" in "J&B Solutions" stood for the first name of Brian's wife, claimed that he did not know Brian's wife's name. When asked why he had sent confidential customer purchase orders to Brian, Nick claimed that he may have done so because he occasionally asked Brian for help in picking up products from that customer. Given his demeanor and his apparent lack of forthrightness about

-15-

his knowledge of S&T and J&B, SunSource informed Nick that it was suspending him effective immediately, and that it would need to collect his company-issued laptop and cell phone in the next few days for forensic imaging.

66.    Nick agreed to turn over his devices, but asked if he should have his cell phone number forwarded to anyone else while he was on suspension in case one of his customers called. SunSource instructed Nick in no uncertain terms that he should *not* forward his cell phone number to anyone, that SunSource would take care of forwarding his number to his supervisor, and that he was not to have any contact with customers while on leave.

67.    Later, SunSource would discover that within hours of leaving that meeting, Nick ignored SunSource's instructions and forwarded his cell phone number—to Brian.

68.    SunSource then met with Brian. Unlike Nick, Brian admitted to most of the misconduct that SunSource had uncovered, but claimed that he "did what he had to do in the interest of his customers." Brian admitted that he had a financial interest in S&T, and admitted that doing so was a violation of his Agreement with SunSource.

69.    Brian also admitted that J&B sold a flowmeter to Customer 2, and that doing so was competing against SunSource. While Brian claimed that he had only sold the flowmeter through J&B because he could not get the purchase order submitted to SunSource due to an alleged technical issue, he admitted that he "probably should not have done that." Brian also admitted that J&B sold water pumps to other customers, but claimed that doing so was not competing against SunSource because SunSource does not offer those types of pumps. Brian's claim is false: the water pumps that J&B sells are directly competitive with products offered by SunSource.

70.    Finally, with regard to Intertech, Brian admitted that he had sent overflow remanufacturing work to S&T through Intertech, and that he knew S&T was not approved by

-16-

SunSource to do that work. Brian claimed that his conduct was acceptable because he deemed it to be in the best interests of the customer. Brian also stated that he knew of the arrangement whereby S&T sold product to Intertech, which then sold product to SunSource, but claimed that SunSource was aware of this arrangement. Brian's claim is again false: SunSource was never informed of that arrangement, and never would have approved of it.

71.     At the conclusion of their meeting, SunSource placed Brian on administrative leave effective immediately, and informed him that he would need to turn in his company-issued laptop. SunSource also requested that Brian voluntarily turn in his phone for forensic imaging. While Brian initially claimed that he was willing to do so, he later reneged and refused to provide his cell phone for further investigation.

72.     The forensic imaging of Nick's cell phone, however, further confirmed the extent of the Bowmans' misconduct.

73.     Specifically, SunSource discovered text messages between Nick and his mother (the other owner of S&T) wherein Nick's mother referenced received "three packing slips" from Brian.

74.     SunSource also discovered text messages between Brian and Nick wherein Brian asked Nick to pick up products for remanufacturing from one of Brian's customers. Nick agreed to Brian's request. The products in question were never sent to SunSource.

75.     Nick also sent text messages wherein he asked Brian to set up a transaction for him at one of SunSource's larger customers, to which neither Nick or Brian was assigned. While the exact nature of that transaction is unclear, what is clear is that Nick indicated to Brian that he wanted to hide the transaction from the SunSource Account Manager who *was* assigned to that account.

76.    Finally, just days before the meetings at which they were suspended, Brian asked Nick to pick up a particular type of product from Customer 2, which Brian said he "needed back" from that customer. When SunSource checked its records, it confirmed that it had never sold that product to Customer 2, even though SunSource offers that exact product.

77.    SunSource also investigated Nick's claim that he may have sent a purchase order to Brian because Brian had on occasion picked up parts from that customer on Nick's behalf. When SunSource spoke to the customer in question, that customer confirmed that Brian had *never* picked up parts on Nick's behalf. Nick's excuse as to why he would have sent a purchase order to Brian was a fabrication.

78.    Moreover, as his text messages confirm, Nick clearly had knowledge of S&T's operations, and the fact that Brian was operating a competing side business (J&B), and performing duties on behalf of another (S&T) while employed by SunSource.

## SunSource Terminates the Bowmans, and the Effect of Defendants' Conduct

79.    On the basis of the entirety of its investigation, SunSource terminated the Bowmans with cause effective November 8, 2019.

80.    Based on the fact that Brian, with Nick's knowledge, is already competing against SunSource through his involvement in two side ventures (and has been for years with S&T), SunSource is understandably concerned that the Bowmans will continue to violate their Agreements by competing against SunSource. SunSource is also understandably concerned, in light of Nick's sharing of confidential customer information with his brother, that the Bowmans intend to continue to combine their knowledge of SunSource's confidential and trade secret information in order to compete against it.

81.    Moreover, it is undeniable that Brian has been trading on SunSource's goodwill with its customers to sell products to those customers through competing entities in which he has

a financial interest. Brian's actions have already damaged, and will continue to damage, SunSource's goodwill with its customers. Indeed, SunSource's customers have already had to inquire as to why Brian was telling them that S&T was a better option for the customer than SunSource.

82.    As a result of these activities, and ongoing unfair competition and breaches of contract, SunSource is being irreparably damaged, with its confidential and trade secret information at significant risk, and its goodwill being damaged.

83.    With the departure of the Bowmans and their knowledge of SunSource's confidential and trade secret information, and their significant access to SunSource's customers, SunSource stands to lose a substantial volume of business as well as losing the value of its goodwill, customer relationships, trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

84.    During their employment with SunSource, the Bowmans were exposed to and helped develop SunSource's confidential and trade secret information related to SunSource's relationship with its customers, and the offerings, programs, plans, and other strategic endeavors SunSource had planned, which included, but was not limited to, its selling strategies, confidential business dealings with its manufacturers and vendors, confidential information relating to customers' preferences, and pricing of SunSource's products and services. All of this information and more constitute SunSource's trade secret information.

85.    Brian, through his involvement with S&T and his ownership of J&B, has already utilized that confidential information and goodwill to compete against SunSource, potentially costing SunSource losses of business with its customers. SunSource's confidential information and customer relationships, however, are invaluable.

86.     Based on the information currently in SunSource's possession, the Bowmans have already breached their Agreements by working on behalf of a competing business, and will continue to do so.

87.     The Bowmans, and along with them both J&B and S&T, will have an unfair advantage in targeting SunSource's customers based on SunSource's goodwill and the Bowmans' knowledge of SunSource's confidential information.

88.     All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to SunSource, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to SunSource's reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make SunSource whole.

**COUNT I**
**<u>BREACH OF CONTRACT</u>**
**(Brian Bowman)**

89.     SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

90.     The Agreement that Brian executed constitutes a valid and enforceable contract.

91.     SunSource performed all of the duties and obligations it agreed to and owed Brian under the Agreement.

92.     Under his Agreement, Brian is required not to solicit SunSource's customers with whom he worked for two years after his termination, compete against SunSource for one year after his termination, or take and/or utilize SunSource's confidential information at any time other than for performance of his job duties. (<u>Ex. A</u> at p. 1.)

93.     In breach of his Agreement, while he was a SunSource employee, Brian solicited customers to do business with J&B and S&T, two companies in which Brian holds a financial interest, instead of SunSource. Upon information and belief, Brian intends to continue to do so.

94.     In breach of his Agreement, Brian competed against SunSource while still an employee by working for J&B and S&T, which are both located within a 100-mile radius of his primary workplace at SunSource for the last three years, and both of which directly compete with SunSource for the same customers and the same types of products.

95.     Because of Brian's breaches, SunSource has been irreparably injured and continues to face irreparable injury. SunSource is threatened with losing the value of its confidential and proprietary information and certain customer relationships, along with income and goodwill, for which a remedy at law is inadequate.

96.     Accordingly, Brian must be enjoined and restrained by Order of this Court.

## COUNT II
## BREACH OF CONTRACT
### (Nick Bowman)

97.     SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

98.     The Agreement that Nick executed constitutes a valid and enforceable contract.

99.     SunSource performed all of the duties and obligations it agreed to and owed Nick under the Agreement.

100.    Under his Agreement, Nick is required not to take and/or utilize SunSource's confidential information at any time, other than for performance of his job duties. (Ex. B at p. 1.)

101.    In breach of his Agreement, Nick competed against SunSource while still an employee by performing services on behalf of J&B and/or S&T, both of which are located within

a 100-mile radius of his primary workplace at SunSource for the last three years, and both of which directly compete with SunSource for the same customers and the same types of products.

102.    In breach of his Agreement, upon information and belief, Nick also took SunSource's confidential information and shared it with Brian in order to allow Brian to solicit Nick's customers on behalf of J&B and/or S&T.

103.    Because of Nick's breaches, SunSource has been irreparably injured and continues to face irreparable injury. SunSource is threatened with losing the value of its confidential and proprietary information and certain customer relationships, along with income and goodwill, for which a remedy at law is inadequate.

104.    Accordingly, Nick must be enjoined and restrained by Order of this Court.

**COUNT III**
**ATTORNEYS' FEES**
**(TEX. CIV. PRAC. & REM. CODE ANN. § 38.001, *et seq.*)**
**(Brian Bowman and Nick Bowman)**

105.    SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

106.    In light of their breaches of their written Agreements with SunSource, SunSource is entitled to recover its reasonable attorneys' fees and costs from Defendants Brian Bowman and Nick Bowman.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(Brian Bowman)**

107.    SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

108.    As an employee of SunSource, Brian owed certain fiduciary duties to SunSource.

109.    Brian's fiduciary duties to SunSource included a duty not to divert business away from SunSource while employed there, or assist others in doing so.

110.    Brian breached his fiduciary duty to SunSource by diverting business to other entities in which he has a financial interest, while he was employed by SunSource.

111.    Brian's actions as described herein were a breach of his fiduciary duties to SunSource.

112.    Brian's breaches of his fiduciary duties have damaged SunSource.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(Nick Bowman)**

113.    SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

114.    As an employee of SunSource, Nick owed certain fiduciary duties to SunSource.

115.    Nick's fiduciary duties to SunSource included a duty not to divert business away from SunSource while employed there, or assist others in doing so.

116.    Nick breached his fiduciary duty to SunSource by diverting business to other entities in which he has a financial interest, while he was employed by SunSource.

117.    Nick also breached his fiduciary duties to SunSource by lying to SunSource about his knowledge of the other Defendants' activities.

118.    Nick's breaches of his fiduciary duties have damaged SunSource.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(J&B and S&T)**

119.    SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

-23-

120.    SunSource's Agreements with the Bowmans are valid and enforceable contracts.

121.    S&T and J&B were aware of the Agreements as well as the restrictions contained therein.

122.    S&T and J&B incentivized the Bowmans to breach the Agreements by giving the Bowmans a financial incentive to divert business away from SunSource while the Bowmans were employed there.

123.    S&T and J&B tortiously interfered with the Agreements in order to allow S&T and J&B to trade off of SunSource's goodwill

124.    S&T and J&B's tortious interference with the Agreements has damaged SunSource.

**COUNT VII**
**<u>CONSPIRACY</u>**
**(All Defendants)**

125.    SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

126.    Defendants combined their efforts to divert business from SunSource, as described herein.

127.    Defendants all reached a meeting of the minds on the objective of their course of action: specifically, to use SunSource's confidential and trade secret information, goodwill, and customer relationships to divert business away from SunSource.

128.    Defendants undertook multiple unlawful, overt acts in furtherance of that objective, including the numerous breaches of the Agreements and misuse of SunSource's confidential and trade secret information.

129.    Defendants' actions have damaged SunSource.

## COUNT VIII
## AIDING AND ABETTING
### (All Defendants)

130.    SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

131.    Defendants each, with unlawful intent, gave substantial assistance and encouragement to other Defendants to engage in unlawful acts.

132.    S&T, Nick, and J&B gave substantial assistance and encouragement to Brian to breach his fiduciary duties and contractual obligations owed to SunSource.

133.    Brian and S&T gave substantial assistance and encouragement to Nick to breach his fiduciary duties and contractual obligations owed to SunSource.

134.    Defendants' actions have damaged SunSource.

## COUNT IX
## FRAUD
### (S&T and Brian Bowman)

135.    SunSource hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraphs 1 through 88.

136.    Defendants S&T and Brian Bowman worked together to defraud SunSource. Specifically, S&T and Brian made false, material representations to SunSource that repairs actually done by S&T were instead being performed by Intertech.

137.    S&T and Brian knew their representations about the source of that work were false. Moreover, S&T and Brian knew that if SunSource had known S&T was performing that work, it would have ceased those orders since S&T had already been specifically rejected to perform such work for Intertech.

138.    S&T and Brian intended for SunSource to rely upon their misrepresentations and continue accepting such work from Intertech. SunSource did in fact rely upon those misrepresentations.

139.    SunSource has been damaged as a result of Brian's and S&T's fraudulent conduct.


**COUNT X**
**ACTUAL AND THREATENED MISAPPROPRIATION OF TRADE SECRETS**
**(TEXAS UNIFORM TRADE SECRETS ACT, TEX. CIV. PRAC. & REM. CODE ANN.**
**§134A.001, *et seq.*)**
**(All Defendants)**

140.    SunSource hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 88.

141.    SunSource's confidential and proprietary information includes, *inter alia*, SunSource's overall sales strategies, pricing, customer preferences, confidential contracts with customers and vendors, customer confidential information, and other information identified above.

142.    This information constitutes trade secrets, pursuant to the Texas Uniform Trade Secret Act, TEX. CIV. PRAC. & REM. CODE ANN. §134A.002(6), because SunSource derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

143.    Defendants actually misappropriated and threaten to continue to misappropriate SunSource's trade secrets without its consent, in violation of Texas law.

144.    Defendants will be or are being unjustly enriched by the misappropriation of SunSource's trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, acquire and/or otherwise misappropriate its trade secrets.

145.    Defendants' actual misappropriation has been willful and malicious, particularly given the Bowmans' repeated efforts to use their knowledge of SunSource's customer preferences to divert business from SunSource while employed there.

146.    As a result of the actual and threatened misappropriation of SunSource's trade secrets, SunSource has been injured and faces irreparable injury. SunSource is threatened with losing its trade secrets in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

**COUNT XI**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *et seq.***

147.    SunSource hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 88.

148.    The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

149.    Defendants acquired SunSource's trade secrets by improper means and without authorization. In particular, Defendants obtained trade secrets from SunSource through, *inter alia*, the Bowmans' access and use of SunSource's confidential information and trade secrets on behalf of competing enterprises. As discussed in great length above, SunSource's investigation identified multiple instances in which the Bowmans, on behalf of S&T and J&B, used SunSource's trade secret information regarding customers to sell competing products.

150.    The information that the Bowmans have provided to S&T and J&B or used on behalf of those entities includes SunSource's strategic plans, customer preferences, contract terms, and pricing terms, all of which constitute trade secrets within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

151.    As detailed above, SunSource takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

152.    Defendants knew or should have known that SunSource's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by SunSource at great expense and effort; (d) are maintained as confidential and are not generally available to the public or SunSource's competitors; (e) would provide significant benefit to a competitor seeking to compete with SunSource; and (f) are critical to SunSource's ability to conduct its business successfully.

153.    The information that Defendants have misappropriated or threaten to misappropriate describes and relates to SunSource's highly confidential business plans and customer preference information, which involve services that are sold in, utilized throughout, and/or travel through interstate commerce.

154.    Should Defendants continue to disclose or threaten to disclose, or use or threaten to use, SunSource's trade secrets, the disclosure and/or use of such information will harm SunSource and its legitimate business interests.

155.    Because Defendants' misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, SunSource request that this Court

grant injunctive relief against Defendants from actual or threatened disclosure or utilization of SunSource's trade secrets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff STS Operating, Inc. d/b/a SunSource seeks judgment in its favor and an Order against Defendants that grants the following relief:

A.     Temporarily and preliminarily enjoining Defendant Brian Bowman, and all parties in active concert or participation with him, from violating his Agreement with SunSource by directly or indirectly soliciting, servicing, contacting, accepting business from, conducting business with SunSource's customers with whom he had prior contact, through November 8, 2021;

B.     Temporarily and preliminarily enjoining Defendant Nick Bowman, and all parties in active concert or participation with him, from violating his Agreement with SunSource by directly or indirectly soliciting directly or indirectly soliciting, servicing, contacting, accepting business from, conducting business with SunSource's customers with whom he had prior contact, through November 8, 2021;

C.     Temporarily and preliminarily enjoining Defendant Brian Bowman, and all parties in active concert or participation with him, from competing against SunSource as that term is defined in his Agreement, including but limited to conducting business within 100 miles of his former SunSource territory through November 8, 2020;

D.     Temporarily and preliminarily enjoining Defendant Nick Bowman, and all parties in active concert or participation with him, from competing against SunSource as that term is defined in his Agreement, including but limited to conducting business within 100 miles of his former SunSource territory through November 8, 2020;

E.     Temporarily and preliminarily enjoin all Defendants, and all parties in active concert or participation with them or receiving notice of any injunction, from using or disclosing any of SunSource's confidential, proprietary and/or trade secret information;

F.     Ordering all Defendants and all parties in active concert or participation with them or receiving notice of any injunction, to return to SunSource all originals and copies of all files, devices and/or documents that contain or relate to SunSource's confidential, proprietary, and/or trade secret information;

G.     Ordering all Defendants and all parties in active concert or participation with them, to preserve all documents, data, and electronic information and to

produce for inspection and imaging all computers, other electronic storage devices, Cloud-based storage repositories, and email accounts belonging to, under the control of, accessible to, or operated by Defendants;

H.      Awarding SunSource compensatory damages in an amount not less than $100,000.00;

I.      Awarding SunSource its reasonable attorneys' fees and costs;

J.      Awarding SunSource exemplary and/or punitive damages; and

K.      Awarding SunSource such further relief as the Court deems necessary and just.


Dated: November 11, 2019

/s/ Bobby G. Pryor
Bobby G. Pryor
State Bar No. 16373720
Dana G. Bruce
State Bar No. 03232032

Pryor & Bruce
302 N. San Jacinto
Rockwall, Texas 75087
Telephone: (972) 771-3933
Facsimile: (972) 771-8343
bpryor@pryorandbruce.com
dbruce@pryorandbruce.com

Michael D. Wexler (** application for *pro hac vice* admission to be submitted)
Kevin J. Mahoney (**application for *pro hac vice* admission to be submitted)
SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
mwexler@seyfarth.com
kmahoney@seyfarth.com

*Attorneys for Plaintiff*

59893827v.2